IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACQULYN D. BROOKS,

           Plaintiff,

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

           Defendant.

CIVIL ACTION FILE NO.

1:09-CV-2458-JFK

## FINAL OPINION AND ORDER

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration which denied her applications for a period of disability, disability insurance benefits, and Supplemental Security Income. For the reasons set forth below, the court **ORDERS** that the Commissioner's decision be **REVERSED** and that the case be **REMANDED** for further proceedings.

## I.    Procedural History

Plaintiff Jacqulyn D. Brooks filed applications for a period of disability, disability insurance benefits, and Supplemental Security Income on January 8, 2004.

[Record ("R.") at 82-85, 200-02].  Plaintiff alleged that she became disabled on April 2, 2003, due to pain in her back, left lower extremity, head, neck, and right upper extremity.  [R. at 767-70, 774-80, 797-811].   After her applications were denied initially and on reconsideration, an administrative hearing was held on August 24, 2006.  [R. at 763-92].  The Administrative Law Judge ("ALJ") issued a decision on October 27, 2006, denying the claimant's applications.  [R. at 212-22].  The Appeals Council granted Plaintiff's request for review and remanded the case back to the ALJ on November 29, 2007.  [R. at 227-31].  The ALJ then took additional evidence and held a new hearing on May 6, 2008.  [R. at 793-835].  The ALJ issued a decision on June 17, 2008, again finding that Plaintiff was not disabled.  [R. at 22-30].  After the Appeals Council denied Plaintiff's request for review on July 1, 2009, Plaintiff filed a complaint in this court on September 4, 2009, seeking judicial review of the final decision.  [R. at 8-10; Doc. 1].  The parties have consented to proceed before the undersigned Magistrate Judge.

## II.    Statement of Facts

The ALJ found that claimant Jacqulyn Brooks has status post piriformis release, status post Chiari decompression and cervical laminectomy, and complex regional pain syndrome.  [R. at 25].  Although these impairments are "severe" within the meaning

2

of the Social Security Regulations, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. at 25].  The ALJ found that the claimant has the residual functional capacity to perform the following: lift and carry ten pounds frequently and twenty pounds occasionally; stand and walk for six hours in an eight hour day with an option to change position in thirty minute increments; sit for four hours in an eight hour day with an option to change position in twenty minute increments; climb stairs; occasionally stoop; and the ALJ found that the claimant cannot climb ladders or work at heights.  [Id.].  The ALJ found that Plaintiff could not perform her past relevant work, but he concluded that there were a significant number of jobs in the national economy that she is able to perform, such as parking lot cashier, counter clerk, and information clerk.  [R. at 29].  Accordingly, Plaintiff was not under a disability at any relevant time.  [R. at 30].

The ALJ's decision [R. at 24-30] states the relevant facts of this case as modified herein as follows:

The claimant testified at the hearing that she became disabled from working in April 2003 after she injured her back, knees, and ankle in a work related injury in October 2002.  A bone scan of the whole body was performed on February 11, 2003,

to evaluate a five month history of left hip pain related to her work injury.  Dr. David Monson examined the claimant on May 1, 2003, to evaluate an incidental finding on the bone scan of a benign bone lesion in the left femoral neck.  He noted that the claimant was unable to work at that time due to radicular leg pain but that the pain did not appear to be related to the bone lesion.  (Exhibit 25F).

Dr. Alan Davis noted on June 2, 2003, that both he and Dr. Monson agreed that the enchondroma seen in the claimant's hip was not the source of her back and leg pain.  He stated that an MRI study of the spine also did not reveal findings that indicated the spine was the source of her pain either but that the study did reveal a piriformis on the left.  He noted the piriformis was possibly the cause of her pain.  His opinion was based primarily on her physical examination and lack of objective findings from other diagnostic testing.  On June 17, 2003, Dr. Davis hospitalized the claimant at Fayette Community Hospital and performed a piriformis release on the left buttock.  In follow up with Dr. Davis prior to August 15, 2003, the claimant initially reported almost complete resolution of her pain.  However, on August 15, 2003, she reported that her pain had steadily increased for the past month.  She was diagnosed with probable trochanteric bursitis on the left and residual sciatic nerve irritability secondary to the damage within the nerve and was treated with injections and

4

prescribed Neurontin.  Treatment notes through January 9, 2004, reflected the claimant had little improvement despite medication therapy, but there were no objective findings to support her allegations of pain.  X-ray studies of the left hip were repeated in January 2004, but when compared with the studies in February 2003, there were no changes.  (Exhibits 1F through 3F, 5F).

Dr. Michael Gorum referred the claimant to Dr. Benjamin Auerbach on January 13, 2004, for further evaluation of left sciatic notch pain which radiated down her left lower extremity.  His impression was left lower extremity dysesthesias of obscure etiology, and she was prescribed hydrocodone 500 mg, Soma, and Gabitril for treatment of her pain.  (Exhibits 7F and 21F).

Dr. Davis referred the claimant to Rehab Associates on January 23, 2004, for a functional capacity evaluation.  During the testing, the claimant was able to walk for ten minutes and perform repetitive bending and crouching.  The claimant stopped the exercise of repetitive kneeling after seven times due to lumbar pain, but she was able to balance on a single leg stance for twelve to seventeen seconds.  It was the examiner's opinion that there was symptom magnification during the testing.  His opinion was supported by the results of the non-physiological tests which were a profile of a series of pain evaluations by pain ratings, pain questionnaires, and

5

observed movement patterns.  There were positive Waddell signs, and on a pain scale of one to ten with ten being the worst pain, the claimant reported that prior to the evaluation her pain was eight and, afterward, that her pain was nine out of ten.  Those pain scores indicated severe pain which was inconsistent with the physical activities she was able to perform during the evaluation.  In addition, her heart rate never exceeded 94 which did not reflect maximum effort, particularly on the occasional and frequent strength test as her maximum heart rate should have been approximately 179. Maximum voluntary effort testing also revealed a sub-maximal effort.  (Exhibit 6F).

In follow up with Dr. Auerbach on January 26, 2004, the claimant reported that the hydrocodone did not provide relief of her pain and caused drowsiness.  It was noted that the claimant had no clear evidence of an etiology for her continued symptoms, and based on the physical examination, there was also no evidence of an impairment or disability.  Dr. Auerbach discontinued the hydrocodone and Soma but continued to prescribe Gabitril, an anticonvulsant medication.  The claimant returned on April 26, 2004, and rated her pain as severe and constant and stated her pain was exacerbated with activity and improved when she was able to lie down.  The claimant was treated with injections and prescribed Ultram in addition to her current medication, Gabitril. The claimant was to return to Dr. Auerbach in four weeks, but there is no evidence of

6

record that the claimant returned for further pain management after that date. (Exhibit 7F and 21F).

The claimant presented to Dr. Craig Chebuhar on June 23, 2004, with complaints of lumbar pain radiating to the left lower extremity and left knee pain. She reported her current medications included Neurontin for leg pain and that she had tried multiple narcotic medications which provided only minimal relief. The claimant noted the knee pain was a separate issue and occurred when transitioning from a sitting to a standing position. On examination, she was very tender with light palpation in the lumbar spine but straight leg raising test was negative bilaterally. X-ray studies of the lumbar spine failed to reveal evidence of an acute pathology. Dr. Chebuhar's impression was chronic lumbar myofascial pain, left hip bursitis, left leg radicular pain, and left knee pain. An MRI study of the knee performed on July 7, 2004, did not reveal any abnormalities. At her follow up visit on July 21, 2004, the claimant was treated with injections and was referred to Dr. Robert Windsor for pain management as she did not require back surgery and because there did not appear to be a structural problem with her left knee. (Exhibit 14F).

The claimant was treated at Southern Regional Medical Center's emergency room on September 2, 2004, after she fell in a hole, twisting her left ankle and back.

X-ray studies of the lumbar spine revealed only very mild degenerative changes. There was also no indication in the treatment notes that the claimant's complaints of back pain were chronic in nature. (Exhibit 15F). The claimant sought follow up care for the left ankle sprain at Resurgens Orthopaedics on September 9, 2004. The claimant noted continued pain and swelling, but there were no complaints of back pain. The claimant was prescribed an ankle brace and rehabilitation therapy through October 12, 2004. (Exhibit 16F). The claimant underwent chiropractic treatment with Dr. Robert Waikel for the period of October 28, 2004, through December 3, 2004. On that date, he noted the claimant had been released from his care as she experienced only minimal low back pain. (Exhibit 17F).

Dr. Charles Scott examined the claimant on April 17, 2006, for a medical consultative evaluation. The claimant described the intensity of her low back pain that radiated to her toes on the analog pain scale as ten and that the pain was exacerbated with activity. However, her report that her current medication regimen was only over the counter pain relievers which were somewhat successful in controlling her pain is inconsistent with the severity of pain as described by the claimant. On examination, the spine was normal to inspection and palpation, and the cervical spine revealed a normal range of motion. The claimant had no pain on range of motion in the lumbar

8

spine, but the straight leg raising test was positive bilaterally. The claimant walked with a slight limp, and she was unable to squat, heel or toe walk, and tandem walk; but there was no evidence of muscle fasiculations and atrophy or obvious limb asymmetry. She was diagnosed with chronic leg pain and enchondroma, and Dr. Scott opined that the claimant needed patient education, lifestyle changes, risk factor reduction such as weight loss, and a supervised progressive exercise program to improve her quality of life. It was his opinion that in an eight hour day, the claimant could occasionally lift and carry less than ten pounds, stand and walk combined for two hours, and occasionally balance but never climb, stoop, crouch, kneel, or crawl. (Exhibit 11F).

However, after December 2004, there is no evidence of record that the claimant required further treatment for any condition until May 31, 2006, when she presented to Southern Regional Medical Center's Community Care Center in follow up to an emergency room visit on May 21, 2006, for right shoulder pain. The claimant was referred to the orthopaedic clinic and prescribed a short term prescription of Vicodin, Ibuprofen 800 mg, and Elavil for the acute pain. (Exhibits 26F and 27F). The claimant was examined at the Grady Health System's Orthopaedic Clinic on October 23, 2006, for an evaluation of right shoulder blade pain. The claimant reported she had experienced right shoulder pain that radiated to her right upper extremity for the past

9

five months, but there were no complaints of back pain that radiated to the left lower extremity. On examination, the claimant had decreased sensation in the right upper extremity, decreased range of motion in the cervical spine, and positive Spurling's on the right. An MRI study of the cervical spine on October 25, 2006, revealed a benign appearing syrinx within the entire cervical cord to the thoracic spine at T6-7. The claimant was diagnosed with Chiari malformation and was hospitalized on December 22, 2006, at Grady Health System. Dr. Albert Schuette performed a suboccipital craniectomy and C-1 laminectomy for decompression secondary to the syrinx. The claimant was advised that the Chiari decompression would not significantly improve her body pain but that it would prevent worsening of her symptoms. The claimant was evaluated by physical therapy and occupational therapy, and it was determined the claimant did not require rehabilitation services. She was released in stable condition on December 28, 2006. (Exhibit 28F). Treatment notes from Grady Health System reflected the claimant has continued to return in routine follow up after the Chiari decompression in December 2006. (Exhibit 29F at 497-501).

The claimant testified that she was referred to a neurologist at Crawford Long Hospital on April 14, 2008, to see if she was a candidate for a spinal cord stimulator. However, Dr. Allan Levine testified at the hearing that all motor examinations have

been within the normal range except on one occasion and that there were no objective findings in the evidence of record to suggest nerve damage or impingement in the upper or lower extremities.  Dr. Levine also testified that, based on his review of the objective medical evidence, the claimant could perform light work that allowed for a sit/stand option.  The claimant was allowed thirty days after the hearing to supplement the record by obtaining additional medical evidence from her office visit to the neurologist at Crawford Long.  However, no additional medical evidence was received by the date of the ALJ order.

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## III.   Standard of Review

An individual is considered to be disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity

11

that the claimant is not only unable to do her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

The scope of judicial review of the Commissioner's decision is limited.  The court's function is to determine: (1) whether the record, as a whole, contains substantial evidence to support the findings and decision of the Commissioner; and (2) whether the Commissioner applied proper legal standards.  See Vaughn v. Heckler, 727 F.2d 1040, 1042 (11th Cir. 1984).  Substantial evidence is more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating that she is unable to perform her former type of work.  If the claimant satisfies her burden of proving disability with respect to her former type of work, the burden shifts to the Commissioner to demonstrate that the claimant, given her age, education, work experience, and impairment, has the capacity to perform other types of jobs which exist in the national economy.  See Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983).

12

Under the regulations as promulgated by the Commissioner, a five step sequential procedure must be followed when evaluating a disability claim. <u>See</u> 20 C.F.R. §§ 404.1520(a) and 416.920(a). In the sequential evaluation, the Commissioner must consider in order: (1) whether the claimant is gainfully employed, 20 C.F.R. §§ 404.1520(b) and 416.920(b); (2) whether the claimant has a severe impairment which significantly limits her ability to perform basic work-related functions, 20 C.F.R. §§ 404.1520(c) and 416.920(c); (3) whether the claimant's impairments meet the Listing of Impairments, 20 C.F.R. §§ 404.1520(d) and 416.920(d); (4) whether the claimant can perform her past relevant work, 20 C.F.R. §§ 404.1520(e) and 416.920(e); and (5) whether the claimant is disabled in light of age, education, and residual functional capacity, 20 C.F.R. §§ 404.1520(f) and 416.920(f). If, at any step in the sequence, the claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. <u>See</u> 20 C.F.R. §§ 404.1520(a) and 416.920(a).

## IV.   Findings of the ALJ

The ALJ made the following findings of fact:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.   The claimant has not engaged in substantial gainful activity since April 12, 2003.

3.    The claimant has the following severe impairments: status post piriformis release, status post Chiari decompression and cervical laminectomy, and complex regional pain syndrome (20 C.F.R. 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    The claimant has the residual functional capacity to perform, in an eight hour day, lifting and carrying ten pounds frequently and twenty pounds occasionally, standing and walking for six hours with an option to change position in thirty minute increments, and sitting for four hours with an option to change position in twenty minute increments.  She can climb stairs and occasionally stoop, but she cannot climb ladders or work at heights.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.    The claimant was born on December 13, 1962, and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.     The claimant has not been under a disability, as defined in the Social Security
        Act, from April 12, 2003, through the date of the ALJ's decision.

[R. at 24-30].

## V.     Discussion

In the present case, the ALJ found at the first step of the sequential evaluation that Plaintiff Jacqulyn Brooks has not engaged in substantial gainful activity since the alleged onset of disability on April 12, 2003.  [R. at 24].  At the second step, the ALJ determined that the claimant has status post piriformis release, status post Chiari decompression and cervical laminectomy, and complex regional pain syndrome.  [R. at 25].  Although these impairments are "severe" within the meaning of the Social Security Regulations, the ALJ found at the third step that they did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. at 25].  The ALJ found at the fourth step of the sequential evaluation that the claimant was unable to perform her past relevant work as a data entry clerk and substitute teacher.  [R. at 29].  At the fifth step, the ALJ concluded that the claimant is able to perform other jobs that exist in significant numbers in the national economy, such as parking lot cashier (135,000 jobs in the national economy), counter clerk in the photo finishing industry (63,000 jobs in the national economy), and information clerk

15

in business services (65,000 jobs in the national economy).  [R. at 29].  Therefore, the

claimant was not under a disability from April 12, 2003, the alleged onset date,

through June 17, 2008, the date of the ALJ's decision.  [R. at 30].

Plaintiff argues that the ALJ erred when he did not send Plaintiff for a

neurological examination after the Appeals Council ("AC") issued its remand order.

[Doc. 8 at 30-32].  Plaintiff also argues that the ALJ improperly failed to consider the

side effects of her medications.  [Doc. 8 at 32-33].  Finally, Plaintiff contends that the

AC did not consider all of her arguments and failed to address the new evidence

submitted with the appeal.  [Doc. 8 at 33-35].

As noted *supra*, on October 27, 2006, the ALJ issued his first decision in this

case, denying the claimant's applications for a period of disability, disability insurance

benefits, and Supplemental Security Income.  [R. at 212-22].  The AC granted

Plaintiff's request for review and remanded the case back to the ALJ on November 29,

2007.  [R. at 227-31].  In its remand order, the AC wrote the following in pertinent

part:

> [T]he claimant underwent further evaluation on October 23, 2006[,]
> consisting of a MRI.  Because this study showed a Chiari malformation
> and physical examination showed indication of continued cervical pain,
> muscle spasm, and weakness and sensory deficits in the right upper
> extremity, she underwent a sub-occipital craniotomy and laminectomy at

16

C-1 on December 22, 2006.  Clinical records for the period October 12, 2006[,] through March 26, 2007[,] received from Grady Health System indicate that the claimant continued to experience headaches and pain and some weakness in the right upper extremity.  However, the post-operative records are rather limited and do not provide sufficient information to determine the current level of severity of her condition or its impact on her ability to perform sustained work activity.  Because of this reason, the Appeals Council concludes that further medical evidence is needed to address these issues.

Therefore, updated treatment records should be obtained along with a consultative neurological examination. . . .

Upon remand the Administrative Law Judge will:

Obtain additional evidence concerning the claimant's neurological impairment in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 C.F.R. 404.1512-1513 and 416.912-913). The additional evidence may include, if available, updated treatment records and a consultative neurological examination and medical source statements about what the claimant can still do despite the impairment.

[R. at 229-30].

Plaintiff argues that the ALJ failed to fully develop the record when he did not send her for a consultative neurological examination which she alleges was required by the AC's order.  [Doc. 8 at 30-32].  The Commissioner responds that the AC instructed the ALJ to obtain additional evidence upon remand, but a consultative neurological examination was optional and not required.  [Doc. 9 at 6-8; R. at 230].

17

According to the Commissioner, the AC "never stated that the ALJ must obtain a neurological consultative examination." [Id.].  The Commissioner also contends that the ALJ complied with the remand order by obtaining treatment evidence of Plaintiff's orthopedic and neurologic status, including evidence documenting Plaintiff's neurological release surgery and other neurological testing.  [Doc. 9 at 7-9; R. at 319-57, 379-447, 449-518].

Social Security regulations provide, "The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."  20 C.F.R. §§ 404.977(b), 416.1477(b).  Because the ALJ did not send Plaintiff for a consultative neurological examination, the relevant issue is whether the AC ordered one.  The Commissioner correctly notes that in one portion of the remand order the AC instructed the ALJ to obtain additional evidence which "may include, if available, updated treatment records and a consultative neurological examination. . . ." [Doc. 9 at 6-7; R. at 230].  This language seems to indicate that the ALJ was required to obtain some unspecified evidence and that a neurological examination was optional.  However, as Plaintiff pointed out at the hearing before the undersigned, the AC also wrote that "updated treatment records should be obtained along with a consultative

neurological examination." [Doc. 12; R. at 230]. The AC's remand order is not entirely clear.

In Tauber v. Barnhart, 438 F. Supp. 2d 1366 (N.D. Ga. 2006), this court addressed a remand order with a similar lack of clarity. The AC's remand order in Tauber noted the ALJ's finding that the claimant was capable of performing her past relevant work as performed in the national economy. However, the AC found that there was no evidence "clearly indicating that any of those jobs would allow the claimant to alternate between sitting and standing. Further consideration is therefore warranted." Id. at 1375. The AC then wrote, "On remand, the Administrative Law Judge will further develop the record regarding the demands of the claimant's past relevant work, and obtain evidence from a vocational expert to clarify whether the claimant could meet the demands of such work or perform other work existing in significant numbers in the national economy." Id. The remand order instructed the ALJ to further develop the record with regard to the claimant's past relevant work, but it did not specifically order the ALJ to address whether the specified jobs allowed a sit/stand option. Id. In the post-remand decision, the ALJ did not consider or mention a sit/stand option, and the claimant argued that this constituted a failure to follow the AC's order. Id. This court agreed with claimant and wrote:

19

> While the Appeals Council's statements concerning the insufficiency of the previous ALJ's decision in establishing that Claimant's past relevant work would allow her to alternate between sitting and standing could be construed as simply conveying the pertinent facts, when read in the context of the entirety of the Appeals Council's order remanding for further proceedings, the Court cannot subscribe to this view.   The Appeals Council specifically mandated that "further develop[ment]" of the record was required with regard to the demands of Claimant's past relevant work.   In light of the Appeals Council's statements that the previous decision was deficient because of its treatment of the "sit/stand option" and that further review was therefore required, this Court construes the Appeals Council's remand order as requiring the consideration of the "sit/stand option". . . .

Tauber, 438 F. Supp. 2d at 1375-76.  The Tauber court, therefore, found that "because the 'sit/stand option' was not considered or discussed, error has been committed."  Id.

In the present case, the undersigned recognizes that there is a lack of clarity in the language of the AC's remand order.  The AC stated in one section of the remand order that the ALJ was required to obtain additional evidence, but only stated that this evidence "may include" a consultative neurological exam.  [R. at 230].  Taken in isolation, this statement would support the Commissioner's contention that a neurological examination was not required by the AC.  However, "when read in the context of the entirety of the Appeals Council's order remanding for further proceedings, the Court cannot subscribe to this view."  Tauber, 438 F. Supp. 2d at 1375.  The AC's order included a description of Plaintiff's medical condition and

20

explained that there was a need for more records following her craniotomy and laminectomy in December 2006.  [R. at 229].  The AC then wrote that "updated treatment records should be obtained along with a consultative neurological examination."  [R. at 230].  Given the fact that the AC stated that a consultative neurological examination "should be obtained," the undersigned concludes that the ALJ's decision not to obtain one constituted a failure to follow the AC's order.  20 C.F.R. § 404.977(b).  This was a reversible error of law and remand is warranted on this basis.  See Bolen v. Astrue, 2008 WL 694712, at *3 (S.D. Ala. March 12, 2008) (holding that the ALJ's violation of the AC's mandate was a reversible error of law).

Plaintiff also contends that not only did the AC order a neurological exam, but two SSA consultative physicians, Dr. Allan Levine and Dr. Charles Scott, also recommended an examination by a neurologist.[1]  [Doc. 8 at 31-32].  Dr. Scott wrote

---

[1]Plaintiff also makes a brief argument that Dr. Levine, the medical consultant who testified at the administrative hearing, was unqualified because he was an orthopedist and not a neurologist, and that Dr. Levine admitted "that he was not the right person to address the Chiari malformation condition."  [Doc. 8 at 31].  But, as the Commissioner correctly notes, Plaintiff did not object to Dr. Levine at the hearing, and Dr. Levine is an orthopedist and spinal specialist, just like Dr. Alan Davis who performed Plaintiff's release surgeries.  [Doc. 9 at 8 n.2].  "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings of State agency medical and psychological consultants. . . ." 20 C.F.R. § 404.1527(f).

the following in his report dated April 25, 2006: "A physical and occupational therapy evaluation along with orthopedic and physiatrist evaluations would be helpful. And evaluation by a neurologist would also be beneficial." [R. at 312]. There is no evidence that the ALJ ever obtained these evaluations. In addition, at the hearing before the ALJ on May 6, 2008, Dr. Levine testified that "an adequate neurologic evaluation to include EMG and nerve conduction studies of the upper extremity" was needed to determine Plaintiff's post-operative limitations caused by her Chiari malformation. [R. at 817]. While the court finds that the ALJ's decision should be reversed for his failure to follow the AC's remand order, the opinions of Dr. Scott and Dr. Levine provide further evidence that a neurological examination was necessary. For all these reasons, the court **ORDERS** that the ALJ's decision be **REVERSED** and that the case be **REMANDED** for further proceedings. Upon remand Plaintiff should be given a consultative neurological examination as ordered by the AC and recommended by Dr. Scott and Dr. Levine.

Plaintiff also argues that the ALJ improperly failed to consider the side effects of her medications and that the AC did not consider all of her arguments and failed to

---

The court agrees with the Commissioner that Dr. Levine was qualified to testify at the administrative hearing.

address the new evidence submitted with the appeal.  [Doc. 8 at 33-35].  Because

remand is warranted for the reasons discussed *supra*, these arguments need not be

addressed.  However, with respect to the side effects of Plaintiff's medications, the

Commissioner correctly points out that "Plaintiff cites only one instance in this

extensive record where she complained to a physician that she had medication side

effects."  [Doc. 9 at 14; R. at 190].  This instance occurred in January 2004, when

Plaintiff complained to Dr. Benjamin Auerbach that hydrocodone, which he had first

prescribed two weeks earlier, made her drowsy.  [R. at 190, 192].  After Plaintiff

complained to Dr. Auerbach about the drowsiness, he immediately discontinued the

hydrocodone.  [R. at 190].  The ALJ discussed all of these facts in his decision.  [R. at

26].  Given the ALJ's discussion and the paucity of evidence regarding Plaintiff's

medication side effects, the court finds unpersuasive Plaintiff's argument that the ALJ

erred in this aspect of his decision.

Plaintiff's final argument is that the AC erred by failing to address the new

evidence submitted with the appeal.  [Doc. 8 at 34-35].  The AC stated that it

"considered the additional evidence," but it "found that this information does not

provide a basis for changing the Administrative Law Judge's decision."  [R. at 8-9].

Given the AC's statement that the additional evidence was considered, the court finds

23

that Plaintiff is mistaken when she contends that the AC "never addressed [the new evidence] nor indicated whether the new evidence attached to the appeal was considered or accepted." [Doc. 8 at 34]. Nevertheless, upon remand all of the medical evidence that has been submitted during the administrative process will be considered. See 20 C.F.R. § 404.900(b) (stating that with certain limitations, the Social Security Administration "will consider at each step of the review process any information you present as well as all the information in our records").

## VI.    Conclusion

For the foregoing reasons and cited authority, the court finds that the ALJ committed error when he did not send Plaintiff for a neurological examination as ordered by the AC. The ALJ's decision was the result of a failure to apply the proper legal standards. It is, therefore, **ORDERED** that the Commissioner's decision be **REVERSED** and that this action be **REMANDED** pursuant to 12 U.S.C. § 405(g) Sentence Four for further proceedings in accordance with the above discussion. The Clerk is **DIRECTED** to enter judgment in favor of the Plaintiff.

**IT IS FURTHER ORDERED** that, in the event that past due benefits are awarded to the Plaintiff upon remand, Plaintiff's attorney may file a motion for approval of attorney's fees under 42 U.S.C. §§ 406(b) and 1383(d)(2) no later than

thirty days after the date of the Social Security letter sent to Plaintiff's counsel of record at the conclusion of the Agency's past-due benefit calculation stating the amount withheld for attorney's fees.  Defendant's response, if any, shall be filed no later than thirty days after Plaintiff's attorney serves the motion on Defendant. Plaintiff shall file any reply within ten days of service of Defendant's response.

**SO ORDERED**, this 30th day of August, 2010.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

25